LANGLEY FEDERAL CREDIT
UNION, Plaintiff,

v.

Linnie HARP et al., Defendants.

Civ. A. No. 77–1242.

United States District Court,
District of Columbia.

Jan. 2, 1979.

Sidney J. Silver, Washington, D. C., Everette G. Allen, Jr., Thomas A. Grant, Richmond, Va., for plaintiff.

William B. Owens, J. Michael Small, Alexandria, La., Scott P. Crampton, Washington, D. C., for defendant Linnie Harp.

Alan S. Novins, Linda Lazarus, Washington, D. C., Gary S. Jefferson, Little Rock, Ark., for defendant James W. Rice.

George E. Monk, Robert J. Elliott, George W. Miller, Washington, D. C., for defendant Riggs Nat. Bank of Washington.

William A. Glasgow, Stephen A. Trimble, Nicholas D. Ward, Washington, D. C., for defendant Union First Nat. Bank of Washington.

Murray A. Kivitz, Washington, D. C., for defendant American Marine Supply, Inc.

Ben Cotten, Washington, D. C., for defendant Shenandoah Management Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GESELL, District Judge.

*Findings of Fact*

I. *Description of Parties*

A. *Plaintiff*

1. Plaintiff Langley Federal Credit Union ("LFCU") is a credit union chartered under the Federal Credit Union Act, 12 U.S.C. § 1751, *et seq.*, with its principal place of business in Hampton, Virginia. LFCU has assets of approximately $70 million and a membership numbering about 30,000. Its Board of Directors (the "Board"), is composed of volunteer members who are generally full-time military or governmental employees working at Langley Air Force Base. The daily management of the credit union is performed by a general manager and an assistant general manager, who are full-time employees.

2. LFCU, guided by an Investment Committee consisting of three directors, invests among other things, in certificates of deposit issued by federally insured financial institutions. As a matter of established policy, this committee does not authorize a purchase of a certificate of deposit without first receiving and analyzing a recent financial statement of the proposed issuer to determine the issuer's financial strength and stability. The Investment Committee only approves those investments in which the effective rate of interest of the pro-

posed certificate of deposit is higher than the then current yield on analogous government securities. The unanimous consent of all available committee members is required. In July and August 1976, the period of time pertinent to this action, the Investment Committee was composed of Emanuel Boxer ("Boxer"), the Chairman, Ferdinand W. Schmidt ("Schmidt"), and Jesse W. Hughes ("Hughes"). It is significant to note that, at all times relevant herein, the members of the Investment Committee believed that, by statutory proscription, 12 U.S.C. § 1757 and see 12 C.F.R. § 703.1, LFCU (a) could only purchase certificates of deposit in its name from federally insured financial institutions, and (b) could not lend money to private corporations.

### B. *The Defendants*

3. American Marine Supply, Inc. ("AMS") is a corporation existing under the laws of and located in the District of Columbia, having been incorporated in late 1975. Claude Geoffrey Hyde ("Hyde") has always been a director, the president and a stockholder of AMS. For a period of time relevant to this action, Bromley Keables Smith ("Smith") was a director, the vice president and a shareholder of AMS. The corporation owned tugboats which it was attempting to sell to the Government of Nigeria. AMS never earned any profits.

4. Shenandoah Management Corporation ("Shenandoah") is a corporation existing under the laws of and located in the District of Columbia, having been incorporated on May 21, 1976. Dennis P. Bixler ("Bixler")—president, Irwin Nestler ("Nestler")—vice president, Hyde—vice president, and Smith—vice president, have been at all relevant times the officers, directors and shareholders of Shenandoah. This corporation was organized by the aforementioned individuals primarily to sell coal repossessed from mine wastes. Shenandoah never earned any profits. AMS and Shenandoah were not related companies in any formal sense.

5. Originally, there were four additional defendants, including Linnie Harp ("Harp"), James W. Rice ("Rice"), Riggs National Bank of Washington, D. C. ("Riggs"), and Union First National Bank of Washington ("Union First"). However, cash settlements with each of these defendants were effected immediately before or during the trial of this matter.

### II. *Jurisdiction, Venue and the Issues in the Case*

6. The action was instituted under 15 U.S.C. § 78aa and 28 U.S.C. § 1332, the matter in controversy exceeding the sum of $10,000 exclusive of interest and costs.

7. Venue in this district was founded on 15 U.S.C. § 78aa.

8. The Complaint, as modified by a supplemented complaint and the proceedings in this case, alleges five causes of action independently against AMS and Shenandoah: (i) the commission of common law fraud or the conspiring or aiding and abetting thereof, (ii) the violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), and Rule 10b–5 promulgated thereunder or the conspiring or aiding and abetting thereof, (iii) conversion, (iv) mutual mistake of contract, and (v) default on certain promissory notes. Compensatory and punitive damages are sought.

9. The trial was held on November 6, 8, 9 and 13, 1978.

10. The following individuals appeared as witnesses: Boxer, Jean M. Yokum ("Yokum"), assistant general manager of LFCU; James F. Keating, Jr. ("Keating"), an assistant branch manager at Riggs; Michael C. Finnegan ("Finnegan"), a former assistant vice president with loan responsibilities at Riggs; Nicholas W. Newbold ("Newbold"), a former assistant branch manager of LFCU; and Smith. Hyde did not appear. LFCU submitted portions of Hyde's deposition transcript into evidence. No testimony by deposition or otherwise was presented by Rice, who was served but failed to appear. AMS and Shenandoah submitted into evidence portions of the deposition transcripts of Ruby LaNell Poland

("Poland"), a former investment clerk at LFCU, and of Thomas Amiss, general manager of the Fort Eustis Federal Credit Union.

### III. *The Challenged Transactions*

#### A. *The AMS–Riggs Transaction*

11. In early July 1976, AMS, represented by its president, Hyde, entered into an agreement with Rice, a self-employed money broker, whereby Rice would undertake to (i) sell one or more tugboats purportedly owned by AMS and docked in Liberia, or (ii) secure a loan for AMS in excess of $200,000. Upon consummation of either undertaking, Hyde agreed that AMS would pay a commission to Rice.

12. At the time of this agreement and thereafter, the ownership of these tugboats, effectively the sole assets of AMS, was an unsettled question. In early 1976, the tugboats had been attached by a Liberian court because of ownership claims asserted by the Nigerian government as well as for certain unpaid docking fees. By July 1976, the Liberian litigation concerning the tugboats was stalled without any foreseeable resolution. Additionally, by agreement dated April 10, 1976 (PX–2), AMS had sold the tugboats to Terra Marine Liberia, Inc. ("TML"), a company which had been incorporated under the laws of Liberia around April 8, 1976.

13. In early July 1976, Rice telephoned another money broker, Harp. Rice knew from other sources that Harp had connections with federal credit unions, potential sources of funds.

14. During this telephone call, Rice told Harp that his client, AMS, required substantial funds for its business. Harp responded that her experience was limited to the placement of certificates of deposit issued by federally insured financial institutions.

15. During this or a follow-up conversation between Rice and Harp, Rice falsely stated that Riggs was prepared to make a $300,000 loan to AMS in the event that AMS could cause an investor to purchase a Riggs certificate of deposit in the amount of $300,000. Rice then proposed that Harp obtain a credit union to invest in the Riggs certificate of deposit in the credit union's name. He then conveyed the terms of the suggested Riggs certificate of deposit to Harp—$300,000 principal, 7½% interest per annum and a one-year maturity period. Harp agreed to locate a credit union investor. Rice was aware that Harp would transmit these misrepresentations back to her credit union clientele. Rice and Harp decided to split the commission.

16. Around this time, according to Hyde, Rice explained to Hyde that Harp's credit union client would loan $300,000 to AMS subject to the condition that AMS use the funds to purchase a Riggs certificate of deposit in the name of AMS and then, in turn, use the certificate of deposit to collateralize a loan by Riggs to AMS.

17. Significantly, the strange nature of this proposed transaction—using supposed loan proceeds to buy a certificate of deposit and then effectively reborrowing on the same money, paying additional interest—should have caused Hyde, an experienced businessman, immediately to question Rice's description of the arrangement.

18. In early July 1976, Harp telephoned Boxer, Chairman of LFCU's Investment Committee, and represented that Riggs was offering a $300,000 certificate of deposit at 7½% interest per annum with a one-year maturity period (the "Riggs CD"). Boxer relied on these representations as accurate, partly because LFCU had previously made six successful investments in certificates of deposit, approximating $3,500,000, at the initiation of Harp. Boxer decided that the proposal was a potentially favorable investment according to the Investment Committee's policies. Because the investor typically does not pay a commission to the broker, Harp and Boxer did not discuss a commission.

19. On the same day, Boxer then contacted Schmidt, a member of the Investment Committee, who confirmed the attractiveness of the Harp proposal by the Investment Committee standards as well as the availability of $300,000 for investment.

20. Shortly thereafter on the same day, Boxer was again telephoned by Harp. In this conversation, he said LFCU might be interested in purchasing the Riggs CD, provided that the most recent, audited financial statement of Riggs passed the review of the Investment Committee. Aware that Boxer did not then possess such a document, Harp promised that Riggs would mail a financial statement to Boxer immediately. Harp then telephoned Rice, requesting that he arrange to have Riggs mail a financial statement to Boxer.

21. Within several days, Boxer received a financial statement of a private corporation in a Riggs envelope without cover letter or other explanatory note. Believing it to be of no moment, Boxer discarded the financial report. This document was a financial statement of AMS dated as of May 14, 1976 (the "AMS Statement").

22. Rice had earlier requested of AMS that the AMS Statement be made available for dispatch to LFCU. Hyde had obtained a copy of the AMS Statement and given it to Rice, who had then mailed the document to LFCU. The AMS Statement, essentially a balance sheet, did not fairly represent the financial condition of AMS in several respects.

23. In early July 1976, Harp again called Boxer inquiring about the status of LFCU's investment decision on the Riggs CD. Boxer responded that he still had not received the financial statement of Riggs. Further, he added that a financial statement did come to him, apparently from Riggs, but that the company was unknown to him. Harp stated that the Riggs mail room must have dispatched the wrong financial statement and that she would undertake to remedy the situation. Harp then telephoned Rice and urged that a Riggs financial statement be sent to Boxer. Rice complied with Harp's request. At this time, Boxer's request for the Riggs financial statement was mentioned by Rice to Hyde.

24. In light of Hyde's alleged understanding of the financial arrangements between AMS and LFCU, Boxer's request for a Riggs financial statement surprised Hyde, but Hyde did not undertake an investigation to clarify the situation.

25. About July 11, 1976, Boxer received the Riggs financial statement in a Riggs envelope. Boxer and Schmidt discussed this financial statement by telephone and decided that Riggs was in sound financial shape. A decision was made to invest in the Riggs CD.

26. Shortly thereafter, probably on July 13, 1976, Boxer and Harp again spoke by phone. After reporting receipt and review of the Riggs financial statement, Boxer reconfirmed the terms—$300,000, 7½% interest per annum and a one-year maturity period—of the Riggs certificate and informed Harp of LFCU's decision to invest. Boxer stated to Harp that he would wire the $300,000 to the bank on July 15, 1976, and requested wiring instructions, which he believed from past experience would be obtained by Harp from an official at the issuing bank. Harp volunteered to call Riggs for the instructions.

27. Harp immediately telephoned Keating of Riggs, having been given the latter's name by Rice. Although she had not spoken to Keating before, Harp inferred from Keating's language that he was expecting her call.

28. In the hours immediately before Harp's call to Keating, Hyde and Smith were present in the Riggs main branch office where Keating worked. During that time, Keating overheard fragments of a conversation between Mrs. Nancy Cox ("Cox"), the Riggs branch secretary, and Hyde and Smith concerning their expectancy of certain funds being wire transferred for AMS's account. The amount of money, the identities of the sender and other details were unknown to Keating.

29. In her telephone call to Keating, Harp represented herself to be an investment consultant and not an employee of LFCU, and she asked how the $300,000 should be wire transferred to Riggs for the purchase of certificates of deposit. Keating said, "Have the wire sent 'Attention: Mr. Keating.'" Other details of the conversa-

tion are lost in the confusing and conflicting partial recollections of the participants.

30. Promptly after receiving the instructions from Keating, Harp called Boxer and repeated the information verbatim. Boxer then called Poland, an LFCU investment clerk, to inform her of the terms of the proposed investment and directed her to wire the necessary money on July 15, 1976, in conformity with the instructions of Harp. The wire failed to state the purpose for which the $300,000 was being transferred.

31. Before LFCU's $300,000 arrived at Riggs, Keating received a telephone call from an unidentified woman saying that (i) she was in Boxer's office at LFCU, (ii) LFCU was ready to dispense loan proceeds to AMS, and (iii) LFCU needed a Riggs financial statement to complete its files. No one from LFCU made the telephone call. The source of the call is unknown.

32. On July 15, 1976, LFCU's $300,000 was wired to Riggs. The wire transfer notice contained the instruction "ATTN MR. KEATING." At this time, LFCU believed that it was purchasing a Riggs CD. It did not intend to and had no reason to believe it was making a loan to any corporation. LFCU had, in the normal course of its business, recorded this apparent purchase of a certificate of deposit on its books and reported the investment to the Board.

33. On the same day of the wire, personnel in Riggs' wire transfer department notified Keating that plaintiff LFCU's $300,000 had been received. Keating immediately directed that the $300,000 be deposited into the checking account of AMS at his branch. Before this deposit, AMS checking account had a nominal balance. Keating then called Hyde, informing him that the $300,000 had been deposited in the AMS checking account.

34. At this point, Hyde, a businessman of wide experience, had to have been well aware that the normal indicia of a commercial loan, involving hundreds of thousands of dollars, were absent: (i) the borrower, AMS, had never submitted a loan application to the lender, LFCU, (ii) audited financial statements (including an income state-

ment) of the borrower, had never been discussed with the lender, (iii) pro forma projections of income of the borrower were never sent to LFCU, (iv) LFCU had never instituted the typical credit checks on the borrower, (v) the lender's promissory note had not been used as the instrument of indebtedness, (vi) arrangements for collateralization of the loan had not been made, (vii) no information as to the background of the borrower's directors, officers and shareholders had been provided to LFCU, (viii) the personal guarantees of the directors, officers and shareholders of the borrower had not been executed, (ix) no typical restrictions on the use of loan proceeds—for example, prohibitions as to the repayment of loans extended by the directors, officers and shareholders to the borrower—had been imposed, and (x), perhaps most importantly, no simultaneous exchange of the loan proceeds for an instrument of indebtedness, that is, a promissory note, had occurred. At the very least Hyde had to have known that LFCU's funds had been transferred to AMS through misunderstanding and mistake. He made no effort to correct the situation.

35. On July 15, 1976, after the money was credited to the AMS account, Hyde met with Keating at the branch and requested that (i) a $300,000 Riggs certificate of deposit be issued in the name of AMS, and (ii) AMS be extended a loan in the amount of $225,000 which would be collateralized by the aforementioned certificate of deposit.

36. Finnegan, a loan officer at Riggs, was perplexed about this loan request. Finnegan's confusion was based on three factors. First, Riggs had previously declined less substantial loan requests from AMS because the company lacked repayment capacity. Second, the history of AMS's recent acquisition of $300,000 was unknown. Third, the necessity of a loan of $225,000 when AMS had $300,000 available in its checking account was commercially inexplicable. Based on all these elements, Riggs declined AMS's loan request, noting on the credit request that "customer should use own money."

37. On July 16, 1976, Keating informed Hyde that AMS's credit request had been denied. Hyde then telephoned Finnegan who explained the above-mentioned reasons for the loan rejection. On this occasion, Hyde again was put on notice that the entire transaction with LFCU lacked validity. However, Hyde did not undertake any verification action with LFCU.

38. On July 16, 1976, Hyde requested that Keating withdraw $225,000 from the AMS checking account and prepare cashier's checks in the amounts of $200,000 payable to TML, and $25,000 payable to James W. Rice. Keating complied with these requests. This action of Hyde was in direct contravention of his supposed understanding of the transaction—that the LFCU proceeds were loaned to AMS to purchase certificates of deposit in the name of AMS. In fact, certificates of deposit in the name of AMS were never purchased.

39. Rice and Harp shared the $25,000 as a commission from AMS.

40. In the days subsequent to July 16, 1976, Hyde, Smith and Rice then wrote checks on the AMS checking account, dispensing about $44,000 among themselves.

41. On either July 19 or 20, 1976, four or five days after the deposit of funds in the AMS checking account at Riggs, Rice requested from Hyde an AMS promissory note payable to LFCU in the amount of $300,000, payable (principal and interest) on July 16, 1978, at 8% interest per annum (the "AMS Note"). Such note was executed but was not mailed to LFCU by either Rice or Hyde until much later, as indicated *infra*.

42. On July 21, 1976, Hyde purchased a $100,000 Riggs certificate of deposit in the name of TML (the "TML CD") with part of LFCU's $300,000.

43. In mid-August, 1976, Poland noted that LFCU had not received the Riggs CD. Poland spoke to Boxer about the missing certificate of deposit. Boxer, believing that the investment in the Riggs CD had been consummated, assumed that the CD was being held by Riggs in safe keeping.

## B. *The Shenandoah-First Union Transaction*

44. In early August 1976, cognizant that Rice had obtained money for AMS, Smith, on behalf of Shenandoah, agreed to pay Rice a commission if he could obtain approximately $400,000–$500,000 in funds. This decision was approved by Bixler and Nestler.

45. Rice was aware that Shenandoah was a recently organized company, nominally capitalized and without a history of sales or profits. Rice also knew that Shenandoah needed substantial funds to commence operations in the coal recovery business.

46. In mid-August 1976, Rice again contacted Harp by telephone, explaining that he had another client which required substantial financing. Similar to the AMS transaction, Rice stated that Union First was prepared to make a $400,000 loan to Shenandoah if the company could cause an investor to purchase a Union First certificate of deposit in the amount of $400,000. Rice then asked Harp to obtain a credit union to invest in the Union First certificate of deposit in the credit union's name, indicating the terms—$400,000, 8½% interest per annum, two-year maturity period—of the proposed investment. On this basis, Harp agreed to locate a credit union to make the investment. Rice and Harp agreed to share the commission.

47. Around this time and thereafter, according to Smith, Rice explained the proposed transaction to Bixler, Nestler and Smith as one in which Harp's credit union client would loan $400,000 to Shenandoah subject to the condition that Shenandoah purchase Union First certificates of deposit in Shenandoah's name and then, in turn, use the certificates of deposit to collateralize a loan by Union First to Shenandoah.

48. Rice obviously made misrepresentations to Harp concerning the true nature of the transaction. Rice was aware that Harp would relay these misrepresentations back to her credit union client.

49. Smith, an experienced businessman, should have immediately questioned Rice's

description of the transaction because of its rather bizarre nature—using apparent loan proceeds to purchase a certificate of deposit and effectively reborrowing on the same money, paying additional interest.

50. About August 21, 1976, Harp telephoned Boxer, proposing that plaintiff LFCU invest $400,000 in a certificate of deposit to be issued by Union First at 8½% interest per annum and with a maturity period of two years (the "Union First CD"). Again, Boxer accepted the accuracy of these investment representations.

51. On the same day, Boxer contacted Schmidt and informed him of the proposed investment. Because the credit union had funds available and the investment standards of the Investment Committee were satisfied, Boxer and Schmidt agreed that the proposal should be pursued.

52. Shortly after this conversation, Boxer and Harp spoke again by telephone. Boxer informed Harp that LFCU might purchase the Union First CD after receipt and analysis by the Investment Committee of the most recent, audited financial statement of Union First. Harp promised that Union First would dispatch immediately the requested document. Harp then telephoned Rice and requested that he obtain and send a Union First financial statement to Boxer.

53. Within two or three days, Boxer received Union First's financial statement in a Union First envelope. Boxer and Schmidt analyzed parts of the financial statement, primarily the balance sheet, and decided that Union First was a sound banking organization. Both individuals agreed that plaintiff LFCU should invest in the Union First CD.

54. On about August 25, 1976, Harp spoke to Boxer by telephone. Boxer stated that LFCU, having received and reviewed the financial statement of Union First, agreed to purchase the Union First CD. He proceeded to verify the terms—$400,000 at 8½% interest per annum and two-year maturity date—of the investment. Boxer then requested wiring instructions, which he realized from past experience with Harp would be obtained by Harp from an official at the issuing bank.

55. Harp promptly telephoned Newbold, an assistant branch manager at Union First, having been given his name by Rice. Newbold initially indicated to Harp that her call was expected.

56. On the occasion of this call, Smith and Nestler of Shenandoah were in the office of Newbold at Union First. Indeed, Smith became a participant in the telephone call from Harp.

57. Some of the conversation among Harp, Newbold and Smith is in conflict. The deposit of incoming funds from LFCU into the checking account of Shenandoah was not expressed in so many words, and Harp definitely requested that the Union First CD be designated in the name of LFCU.

58. Smith and Harp then agreed that the certificate of deposit would be issued in the name of "Special C/D Acct. (Langley FCU–104)", a designation suggested by Smith for the first time during the call.

59. Smith testified that he was under the apprehension that the transaction, in part, would be a loan from LFCU to Shenandoah followed by the purchase of a certificate of deposit in Shenandoah's name. Smith did not state that the certificate of deposit would be issued in Shenandoah's name. Instead, Smith suggested the misleading designation, "Special C/D Acct. (Langley FCU–104)." Harp apparently assumed that the certificate of deposit would effectively be in the name of LFCU.

60. During this same conversation, Harp requested wiring instructions for LFCU's funds. Newbold replied, "Have the wire sent 'Attention: Nicholas Newbold.'" Within the hearing of Newbold, Smith then proceeded to give to Harp a series of digits, "3–148–785," representing an account at Union First. This digital sequence was not identified to Harp as being the checking account number of Shenandoah. The wiring instructions in their composite form thus appeared as "Attention: Nicholas Newbold Account No. 3–148–785." Neither Smith nor Newbold told Harp to put anything else in the wiring instructions.

61. Immediately after receiving the above instructions, Harp called Boxer and repeated the wire instructions as "Attention: Nicholas Newbold Tax # 3–148–785." At the mention of "Tax # 3–148–785," Boxer questioned Harp about the accuracy of this part of the instructions. Harp stated that the bank official had given her these precise words and numbers. Boxer relied on these representations. Immediately after this call terminated, Boxer called Yokum, giving her the terms of the Union First CD and directing her to wire, on August 27, 1976, the necessary funds in conformity with the instructions of Newbold and Harp. Yokum recorded the information.

62. On August 27, 1976, LFCU's $400,-000 was wired to Union First. The wire transfer notice contained the instruction "ATTN NICHOLAS NEWBOLD TAX # 314 8 785." At this time, LFCU believed that it was purchasing the Union First CD. LFCU had, in the normal course of its business, recorded this apparent purchase of a certificate of deposit on its books and reported the investment to the Board. LFCU documentation indicating a loan transaction was never created.

63. Union First received the $400,000 wire transfer from LFCU on August 27, 1976. After a telephone call from the Union First wire transfer department, Newbold confirmed that the money should be placed in the checking account of Shenandoah. Before this deposit the Shenandoah checking account had an insubstantial balance.

64. Newbold called Smith, informing him of the deposit of $400,000 into the Shenandoah checking account.

65. At this point, Smith, Bixler and Nestler, experienced businessmen, had to have known that the normal indicia of a commercial loan involving nearly half a million dollars, as described earlier with respect to the AMS loan, were absent. Moreover, unlike the AMS situation and as admitted by Smith, Shenandoah had never sent a financial statement to LFCU. Smith knew that LFCU could not have intended to transfer $400,000 free and clear into Shenandoah's checking account. Neither Smith nor his associates did anything to clarify the situation.

66. On August 27, 1976, sometime after the deposit of the $400,000 into the Shenandoah checking account, Rice asked Smith and Nestler, on behalf of Shenandoah, to execute a promissory note to plaintiff LFCU in the amount of $400,000 payable (principal) on August 27, 1978, at 8½% interest per annum with interest payable quarterly (the "Shenandoah Note"). This note was not dispatched to LFCU until much later.

67. On August 30, 1976, Smith and Nestler met with Newbold at the Union First branch office and requested that (i) Union First certificates of deposit amounting to $400,000 be issued in the name of "Special C/D Acct. (Langley FCU–104)" and (ii) Shenandoah be extended a $380,000 loan which would be collateralized by the aforementioned certificates of deposit.

68. At this time, Newbold consulted another banking official at Union First concerning the propriety of issuing certificates of deposit in the name of "Special C/D Acct. (Langley FCU–104)." Newbold learned from said official that the bank required that the name of an individual or company be on any certificate of deposit issued by the bank, and passed this information along to Smith. Without any notification to Harp or LFCU, Smith responded that the certificates of deposit should therefore be issued in the name of Shenandoah.

69. Contemporaneously, Union First officials were contemplating the loan request of Shenandoah. Based on several factors, including (i) the lack of financial information, including a financial statement, of Shenandoah, (ii) the want of a definitive repayment plan by Shenandoah, and (iii) the failure by Shenandoah to designate the proposed use of the loan proceeds, Union First denied the loan request on August 30, 1976.

70. The loan request declination was conveyed to Shenandoah on the same day.

At this time, Smith and Nestler were again alerted that the premises of the entire transaction were undermined: the bank was unwilling to make a fully collateralized loan to Shenandoah. Yet, they failed to initiate any communication with LFCU.

71. On August 30, 1976, Smith requested the Newbold withdraw all $400,000 from Shenandoah's checking account and wire transfer (i) $368,000 to Columbia Commercial Mortgage Company ("CCMC"), and (ii) $32,000 to Rice. The request was carried out and was directly contrary to the supposed understanding that the LFCU proceeds were a loan to Shenandoah to purchase certificates of deposit in the name of Shenandoah.

72. CCMC is a company owned by Smith and Bixler and engaged in the real estate business. It had no previous relationship with Shenandoah.

73. On September 2, 1976, CCMC loaned the entire $368,000 to Smith, Nestler and Bixler in equal portions of $122,666.67, evidenced by unsecured notes. These individuals then made capital contributions of the funds to Minerals Management Corporation ("MMC").

74. MMC had been incorporated on August 27, 1976 (the date of the wire transfer to Union First), and capitalized by Smith, Nestler and Bixler at a nominal $1,500. These individuals were also the officers, directors and shareholders of MMC. MMC then used the $368,000 to purchase certificates of deposit in its name from Cobb Bank and Trust Company ("Cobb") in Smyrna, Georgia. Finally, on September 2, 1976, MMC obtained a $400,000 line of credit from Cobb, collateralized by the aforementioned certificates of deposit.

75. As to the $32,000 wired to Rice by Shenandoah, Rice shared this commission with Harp.

### C. *Discovering the Missing Funds*

76. On September 20, 1976, examiners from the National Credit Union Administration noted the absence of the Riggs CD and the Union First CD in LFCU's investment files.

77. On September 20, 1976, Crawford of LFCU telephoned Keating and Newbold to verify the existence of the certificates of deposit. Knowing that LFCU's proceeds had left their respective banks, Keating and Newbold each stated that no certificates of deposit existed.

78. Upon hearing the names of AMS and Shenandoah from these banking officials, Crawford placed telephone calls to the defendant corporations. She was unable to reach AMS. Crawford spoke to Bixler of Shenandoah who falsely stated that a $400,000 certificate of deposit in the name of LFCU was being held by the corporation and would be forwarded to LFCU. Bixler informed Smith and Nestler of this call.

79. Meanwhile, Boxer spoke to Harp on the telephone and demanded her assistance in obtaining the Riggs CD and the Union First CD. Harp immediately called Rice and told him about the problem. On the next day, September 21, 1976, Rice mailed, without cover letter, the AMS Note and the Shenandoah Note to Harp, which were received by her on September 23, 1976. Harp, in turn, forwarded the two promissory notes to LFCU, which notes were received in the mail on October 7, 1976.

80. It was during this period that the full participation of Rice, Hyde, Smith, AMS and Shenandoah started coming to the attention of LFCU.

81. On September 28, 1976, Hyde telephoned Boxer at LFCU. After identifying himself as the president of AMS and TML, Hyde informed Boxer that an apparent misunderstanding had arisen concerning the $300,000 wired to Riggs. Boxer stated that the funds were wire transferred to purchase the Riggs CD and could not be used under the applicable law for any other investment purpose, including a loan to a private corporation. Hyde then falsely told Boxer that the entire $300,000 was used to purchase certificates of deposit in AMS's name. However, Hyde noted that he would attempt to substitute LFCU's name for AMS's name on the certificates of deposit. Around October 1, Hyde again telephoned

Boxer and informed him that the $300,000 of LFCU had been used to purchase (i) the TML CD, and (ii) $200,000 worth of certificates of deposit in the name of TML issued by Services National Bank. This second piece of information was incorrect. Significantly, Hyde said the certificates of deposit collateralized outstanding loans to TML which could not be repaid at the time.

82. Contrary to Hyde's assertions, the TML CD in the amount of $100,000 was still unencumbered. As soon as Hyde knew that LFCU was seeking return of its $300,000, he undertook efforts to pledge the TML CD. The result was that during December 1976, Hyde obtained a loan for TML, pledging the certificate of deposit as collateral—and without the knowledge of LFCU.

83. In late September 1976, Raymond Suttle ("Suttle"), an attorney for LFCU, spoke by telephone with Smith, requesting return of the $400,000. Smith stated that the entire $400,000 had already been expended by Shenandoah. In fact, at that time, about $375,000 had been preliminarily earmarked but could have been returned to LFCU.

84. On September 29, 1976, Smith resigned his positions as an officer and director of AMS.

85. On or about October 7, 1976, Hyde and Smith reviewed a memorandum written by the corporate counsel for AMS and Shenandoah. They learned from this memorandum that a federal credit union could not legally make loans to private corporations. Hyde and Smith did not take any action to freeze (i) the TML CD, or (ii) MMC's $375,000.

86. On October 18, 1976, Arthur W. Carter ("Carter"), a director and secretary of LFCU, along with Suttle, met with Hyde, Smith and Rice. Carter and Suttle again demanded return of the LFCU funds from AMS and Shenandoah. Both Hyde and Smith denied the abilities of their respective corporations to repay any of the funds at that time.

D. *Aftermath*

87. Since November 1976, including after this litigation was commenced in July 1977, LFCU received from Shenandoah seven interest payments of around $8,500, aggregating to $59,000. LFCU placed this money in a separate interest-bearing savings account at another financial institution where it remains today, pending the outcome of this litigation.

88. The AMS Note, due as of July 16, 1978, and the Shenandoah Note, due as of August 27, 1978, are both in default.

### Conclusions of Law

The Court has jurisdiction and the venue is proper. 28 U.S.C. §§ 1332, 1391(a); 15 U.S.C. § 78aa. As previously indicated, LFCU presents several alternative theories of recovery: default on notes, mutual mistake, conversion, fraud, and violation of § 10(b) of the Securities Exchange Act of 1934, as implemented by Rule 10b–5. Both compensatory and punitive damages are sought.

Viewing the proof separately as it relates to AMS and to Shenandoah, the Court has concluded that the preponderance of the evidence establishes a clear case of conversion by each company but that there is insufficient proof to establish that either company committed either common law fraud or a violation of § 10(b).

Conversion, is, of course, a civil tort which involves the taking of property belonging to another. While it is generally said that the motive or intent of the taker as to his right to the property is irrelevant, *see Morissette v. United States*, 342 U.S. 246, 270, 72 S.Ct. 240, 96 L.Ed. 288 (1962); Restatement of Torts 2d §§ 222A, 223 & 244, it is clear in this instance that AMS and Shenandoah each not only took property that did not belong to it but did so knowingly. Statements by Hyde and Smith that they believed that LFCU had entered into genuine loan transactions with their respective companies for the substantial sums of money involved are not accepted. AMS and Shenandoah each knew from the outset that the "loan" received from LFCU

had to have resulted from some error or misunderstanding, not from mere naivete on LFCU's part. Despite this knowledge, each company proceeded to use the funds for its own purposes. Knowledge is inferred from the totality of the facts and circumstances found above, particularly the manner in which the defendants proceeded to handle and disburse the funds after the banks refused them the opportunity to purchase certificates of deposit and the defendants' conduct once subjected to questioning by representatives of LFCU. AMS and Shenandoah were each grossly reckless in their receipt and use of LFCU's funds. Thus LFCU was not solely responsible for the loans' existence. Such conduct by the defendants amounts to conversion with knowledge of its impropriety.

While the issue is a very close one, the Court has concluded that the evidence is not sufficient to establish common law fraud or a violation of Section 10(b). LCFU's theory in this regard is that each defendant aided and abetted Rice's fraudulent conduct. Although the plaintiff is correct in stating that a finding of fraudulent aiding and abetting can sometimes be based on grossly reckless conduct, see Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 44–48 (2d Cir. 1978); Jacobs v. District Unemployment Compensation Board, 382 A.2d 282, 287 (D.C.Ct.App.1978), it cites no case where the reckless conduct was other than with respect to the truth or falsity of operative misrepresentations made or known by the defendant. Here, the defendants made no false representations to LFCU upon which LFCU relied in extending the loans at issue. There is also no direct evidence that any officers of either defendant corporation actually knew of Rice's misrepresentations and thus had an opportunity to make any determination one way or the other with respect to those remarks' truth or falsity. Consequently, plaintiff's theory has to be that the defendants constructively knew the content of Rice's misrepresentations because they acted in a grossly reckless manner in not realizing that the loans they received had to have resulted from misrepresentations made by Rice. Even if

this theory correctly states a cause of action—an issue this Court does not decide, the proof is lacking to support it. Neither Hyde nor Smith are particularly believable witnesses, but the evidence is still insufficient to warrant an inference that their grossly reckless conduct amounted to knowledge of Rice's devious conduct. Defendants knew that they were taking something that did not belong to them but it is not shown that their awareness amounted to knowledge that this situation was created by Rice's false representations rather than by other factors.

LFCU is entitled to compensatory damages for the conversions of its funds. The question remains whether punitive damages should be assessed as to either AMS or Shenandoah. The Court in its discretion has determined that it will not order the payment of punitive damages in this instance by either corporation. Undoubtedly, many factors contributed to the ultimate conversion of the funds and the responsibility cannot be said to rest solely on the conduct of AMS and Shenandoah. There were many stages along the line where the end result could have been prevented had LFCU been more businesslike, had Harp been more astute, had the banks been less careless, etc. Under these circumstances, an exaction of punitive damages solely against AMS and Shenandoah does not seem warranted, particularly considering the generous nature of the settlement made with Rice.

LFCU is entitled to a separate judgment against AMS for $300,000, plus any unpaid interest which accrued on the note prior to default, plus the interest on the two aforementioned sums which has accrued since default at the legal rate of six percent, plus costs; all reduced by the amount Riggs paid and ⅜'s of the amounts Rice and Harp paid the plaintiff in settlement. LFCU is entitled to a separate judgment against Shenandoah for $400,000, plus any unpaid interest which accrued on the note prior to default, plus the interest on the two aforementioned sums which has accrued since default at the legal rate of six percent, plus

costs; all reduced by the amount Union First paid and ⁴/₇'s of the amounts Rice and Harp paid the plaintiff in settlement. The notes themselves are hereby cancelled. Counsel for plaintiff is to submit an appropriate order and form of judgment by January 15, 1979, with a brief memorandum explicating the computations made.